**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IAN GIBSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-1409 |
| | § | |
| NCRC, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This is a lawsuit under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Ian

Gibson worked as a field service technician for NCRC, Inc., a California-based company, for six

months.  Gibson alleges that NCRC's policy of not compensating him and similarly situated

technicians for time spent driving between customers' work sites resulted in failures to pay

minimum wage and overtime required under the FLSA.  Gibson moved to conditionally certify a

class of NCRC field service technicians or employees serving in a similar capacity in the last three

years.  (Docket Entry No. 24).  NCRC responded, (Docket Entry No. 27), and Gibson responded,

(Docket Entry No. 29).  This court heard oral argument on April 19, 2011.  (Docket Entry No. 32).

Based on the record; the motion, response, and reply; the arguments of counsel; and the

relevant law, this court grants the motion for conditional certification and issuance of notice as to

the overtime claim.

Based on the present record, the following class is conditionally certified as to the overtime

pay claim: NCRC employees with the title of field service technician or performing the job duties

of a field service technician,  who were employed within the last three years.  Gibson must clarify

his minimum-wage theory and state what support exists in the record and case law no later than **July**

**25, 2011;** NCRC may file a response no later than **August 1, 2011.**  By **August 19, 2011**, NCRC

must provide the names, current or last known addresses and telephone numbers, and dates of

employment of the members of this class.  Notice must be sent no later than **September 23, 2011**.

The parties must file a proposed amended scheduling and docket control order no later than **August**

**19, 2011**.  The dates set for the joint pretrial order and docket call are cancelled in light of this order.

The reasons are explained in detail below.

## I.      Background

NCRC provides general maintenance services to retailers in 15 western states, including

California and Texas.  (Docket Entry No. 27-1, ¶ 3).  NCRC employs full-time and part-time field

service technicians to provide these services.  NCRC employs approximately 50 to 60 field service

technicians at any given time.  (*Id.* ¶ 4).  Service technicians are assigned to geographical "zones."

NCRC sends a list of available projects to its field service technicians each night.  (*Id.*, ¶ 8).  The

lists describe the service required and estimate the time for completion.  (*Id.*).  Field service

technicians are allowed to select from the list of assignments and schedule them.  (*Id.*).  Field service

technicians typically receive approximately 30 hours of assignments per week, exclusive of drive

time.  (*Id.*, ¶ 9).

Field service technicians report directly to the customers' locations, not to an NCRC office.

Field service technicians use their own vehicles to drive to and from assignments.  NCRC monitors

the time each technician spends at a customer's job site through a telephonic tracking system.  The

technicians punch into the system when they arrive at each job site and punch out when they leave.

NCRC refers to the time technicians spend at the customer job sites as "productive time."  The

technicians record the number of miles traveled between each job site.  NCRC refers generally to

the time spent driving between job sites as "nonproductive time."  The technicians also record the

number of miles in excess of 30 that they drive between their homes and their first and last service

calls of each work day, which NCRC refers to as "reasonable commute distance."

NCRC pays field service technicians $16 to $22 per hour for "productive time."  (*Id.*, ¶ 11).

Productive time includes the time actually providing the customer services and obtaining supplies,

among other activities.  (*Id.*).  Productive time does not generally cover time spent driving to or

between job sites.  NCRC's written policy contains the following language on compensation for

such "nonproductive time":

> Non-exempt field employees are compensated for all non-commute
> drive time spent for the benefit of the company at no less than the
> applicable minimum wage then in effect.  This wage is calculated on
> a per mile rate based upon the presumed distance driven by the
> employee as determined by the company's computer system
> (currently Microsoft Maps) from the job site check-in/check-out
> reported by the employee.  Using a presumed blended average drive
> time rate of 40 miles per hour, this per mile payment will meet or
> exceed the applicable minimum wage.  Any questions about the
> applicable rates of pay should be immediately directed to your
> supervisor.

(Docket Entry No. 24, Ex. C).  For nonproductive drive time that is not considered commute time,

NCRC pays field service technicians $.50 to $.65 per mile.  (Docket Entry No. 27-1, ¶ 12).  The rate

varies by region and is intended to reflect local driving conditions.  (*Id.*).  NCRC bases its

reimbursements on the distance between job sites, not on the actual miles driven.  (*Id.*).  NCRC's

service managers describe this policy to field service technicians when they start working for NCRC.

(*E.g.*, Docket Entry No. 27-7, ¶ 4).

Gibson worked as a field service technician for NCRC from January to June 2010.  Gibson

alleges that he generally worked from 40 to 50 hours per week, including time spent driving from

one service call to another, and excluding commute time between home and the first and last service

calls each work day.  (Docket Entry No. 24, Ex. A, ¶ 4).  Gibson contends that NCRC violated the

3

FLSA by considering only productive time, not drive time, to determine overtime pay.  (*Id.*, ¶¶ 6–9, 13).   He also contends that he was not paid minimum wage because he was not properly compensated for the "nonproductive time" he spent driving from customer to customer.

Gibson seeks conditional certification of a class of "all individuals employed by [NCRC] as 'field service technicians' (or who were performing the job functions of a 'field service technician')" for the last three years and approval of notice to the class.   (Docket Entry No. 24-11).   NCRC opposes certification, arguing that its pay policies comply with the FLSA as a matter of law, that individual issues relating to compensation make collective action treatment inefficient, and that there is no evidence that other employees would opt in.   The arguments and responses are analyzed below.

## II.      The Conditional Certification Standard

The FLSA mandates that a covered employee be paid one and one half times the "regular rate" for hours worked beyond forty hours each week.  29 U.S.C. § 207(a)(1); *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 476 (1948); *Houston Police Officers' Union v. City of Houston*, 330 F.3d 298, 300 (5th Cir. 2003); *Garza v. Smith Int'l, Inc.*, Civ. A. No. C–10–100, 2011 WL 338819, at *1 (S.D. Tex.  Feb. 2, 2011); *Halford v. No Hope Logging, Inc.*, 727 F. Supp. 2d 523, 527 n.3 (S.D. Miss. 2010).   The FLSA also requires payment of a minimum wage.  29 U.S.C. § 206(a). *Maxwell v. G.R.A.C.E. Cmty. Servs.*, Civ. A. No. H-09-3989, 2011 Wl 2565329, at *3 (S.D. Tex. June 28, 2011); *Plewinski v. Luby's Inc.*, Civ. A. No. H-07-3529, 2010 WL 1610121, at *2 (S.D. Tex. Apr. 21, 2010).

Section 216(b) of the FLSA creates a cause of action for employees against employers.  29 U.S.C. § 216(b).  Section 216(b) provides:

> An action . . . may be maintained against any employer . . . by any
> one or more employees for and in behalf of himself or themselves and

> other employees similarly situated.  No employee shall be a party
> plaintiff to any such action unless he gives his consent in writing to
> become such a party and such consent is filed in the court in which
> such action is brought.

*Id.*  Section 216(b) establishes an opt-in scheme under which plaintiffs must affirmatively notify the

court of their intention to become parties to the suit.  *See Mooney v. Aramco Servs. Co.*, 54 F.3d

1207, 1212 (5th Cir. 1995).  District courts have discretion in deciding whether to order notice to

potential plaintiffs.  *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170–71 (1989);

*Villatoro v. Kim Son Rest., L.P.*, 286 F. Supp. 2d 807, 808 (S.D. Tex. 2003).

Notice does not issue unless a court conditionally certifies the case as a collective action.

Courts recognize two methods to determine whether to authorize notice to similarly situated

employees advising them of their right to join an FLSA collective action.  These methods are the

two-step *Lusardi* approach and the class action–based *Shushan* approach.  *See Lusardi v. Xerox

Corp.*, 118 F.R.D. 351 (D.N.J. 1987); *Shushan v. Univ. of Colo. at Boulder*, 132 F.R.D. 263 (D.

Colo. 1990).  Most courts, including district courts in this circuit, use the "two-step *ad hoc*

approach" as the preferred method for the similarly situated analysis, rather than the Rule 23

requirements.  *See, e.g.*,  *Maynor v. Dow Chemical*, 671 F. Supp. 2d 902, 930–31 (S.D. Tex. 2009);

*Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004) (stating that most courts

have employed or implicitly approved the two-step method); *Basco v. Wal-Mart Stores Inc.*, Civ.

A. No. 00-3184, 2004 WL 1497709, at *4 (E.D. La. July 2, 2004); *Villatoro v. Kim Son Restaurant,

L.P.*, 286 F. Supp. 2d 807, 810 (S.D. Tex. 2003); *see also Grayson v. K Mart Corp.*, 79 F.3d 1086,

1096 n.12 (11th Cir. 1996) (noting that "the requirements for pursuing a § 216(b) class action are

independent of, and unrelated to, the requirements for class action under Rule 23"); *Mooney*, 54 F.3d

at 1217 (declining to mandate either theory); *LaChapelle v. Owens-Ill., Inc.*, 513 F.2d 286, 288 (5th

Cir. 1975) (finding a fundamental difference between Rule 23 class actions and FLSA collective actions).

"*Lusardi* and its progeny are remarkable in that they do not set out a definition of 'similarly situated,' but rather they define the requirement by virtue of the factors considered in the [two-stage] analysis." *Mooney*, 54 F.3d at 1213.  The first step of analysis is the "notice stage," in which the district court decides whether to issue notice to potential class members.  *See id.* at 1213–14.  The court's decision at this stage is often based only on the pleadings and affidavits that have been submitted.  *Id.*  "Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class" that provides potential class members with notice and the opportunity to opt in.  *Id.* at 1214 n.8.  Even this lenient standard appears to require  substantial allegations that potential members "were together the victims of a single decision, policy, or plan."  *Id.* (citing *Sperling v. Hoffman-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988)).  At this stage, a plaintiff must make a minimal showing that: (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt in to the lawsuit.  *See Prater v. Commerce Equities Mgmt. Co.*, No. H-07-2349, 2007 WL 4146714, at *4 (S.D. Tex. Nov. 19, 2007); *Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 WL 210008, at *5 (S.D. Tex. Jan. 24, 2007).  A factual basis for the allegations is needed to satisfy the first step.  *See Hall v. Burk*, No. Civ. 301CV2487H, 2002 WL 413901, at *3 (N.D. Tex. Mar. 11, 2002) (stating that "[u]nsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden."); *see also Haynes v. Singer Co.*, 696 F.2d 884, 887 (11th Cir. 1983).

At the first stage, there must be a showing of "some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency." *Barron v. Henry Cnty. Sch. Sys.*, 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003) (citing *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 416 (D. Or. 2002)); *see also Basco*, 2004 WL 1497709, at *5 (quoting *Heagney v. European Am. Bank*, 122 F.R.D. 125, 127 (E.D.N.Y. 1988) (stating that certification is appropriate when some factual nexus binds the named plaintiffs and potential class members as victims of a particular alleged policy or practice)). "A court may deny plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice." *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005); *see also Barron*, 242 F. Supp. 2d at 1104 ("[T]he mere fact that violations occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences.").

Many courts have stated that putative class members must  show that they were affected by a common policy, plan, pattern, or practice to satisfy the "similarly situated" inquiry. *See, e.g.*, *O'Brien v. Ed Donnelly Enters., Inc.*, No. 2:04-CV-00085, 2006 WL 3483956, at *3 (S.D. Ohio Nov. 30, 2006) (citations omitted) ("Plaintiffs must demonstrate that the Defendants had a common policy or plan in violation of the FLSA that negatively impacted the original and opt-in Plaintiffs."); *England*, 370 F. Supp. 2d at 507 (a court may refuse to allow plaintiffs to proceed collectively if the action arises from circumstances purely personal to the plaintiffs and not from any generally applicable rule, policy, or practice); *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 91, 95–97 (S.D.N.Y. 2003) (citations omitted) (a plaintiff must allege a common policy or plan and establish a sufficient factual nexus between his situation and the situation of the proposed classed members); *Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1139 n.6 (D. Nev. 1999) ("In order

7

to be similarly situated, the action must not be distinct and specific to individual plaintiffs; rather, there must be some general policy or practice."). A plaintiff must demonstrate a reasonable basis for the allegation that a class of similarly situated persons exists. *Lima v. Int'l Catastrophe Solutions, Inc.*, 493 F. Supp. 2d 793, 798 (E.D. La. 2007). Uniformity is clearly not necessary. "[T]he 'similarly situated' requirement of § 216(b) is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance) [,so] a unified policy, plan, or scheme of discrimination may not be required to satisfy . . . § 216(b)." *Grayson*, 79 F.3d at 1095; *see also Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 534–35 (S.D. Tex. 2008) (collecting cases).        If a court conditionally certifies a class, the action proceeds as a collective action during discovery. *See Mooney*, 54 F.3d at 1214. The second stage typically occurs when discovery is largely complete and the defendant moves to "decertify" the conditionally-certified class. *See id.*; *Lusardi*, 118 F.R.D. at 359. At that point, the court makes a factual determination as to whether there are similarly situated employees. *Id*. If the district court finds that the claimants are similarly situated, the collective action may proceed. *See Mooney*, 54 F.3d at 1214; *Basco*, 2004 WL 1497709, at *3. If the court decertifies the class, the opt-in plaintiffs are dismissed without prejudice and the original plaintiffs proceed on their individual claims. *England*, 370 F. Supp. 2d at 508.

## III.    Analysis

### A.    The Overtime Claim

Gibson claims that NCRC had a consistent policy of not counting drive time toward overtime hours. (Docket Entry No. 24, Ex. 1, ¶¶ 6–8). NCRC argues that the amount of driving time varies by region and by employee, and that many employees drive so little that no overtime issue arises. NCRC relies on time and mileage records and earnings statements. (*See* Docket Entry No. 24, Exs. E & F). NCRC has also provided affidavits from two field service technicians stating that they

8

generally do not drive much between jobs.  (Docket Entry Nos. 27-3, ¶ 4; 27-4, ¶ 11).  But NCRC

appears not to dispute that some number of NCRC field service technicians have "significant regular

recurring drive time between jobsites."  (Docket Entry No. 27-1, ¶ 14).  And the record includes

evidence showing that while NCRC paid employees $0.50 per mile for driving their own vehicles

during the work day, NCRC did not treat this reimbursement as wages for hours worked and did not

include the time in calculating overtime eligibility.  The NCRC handbook provides that employees

are reimbursed for noncommute travel time at mileage rates set by the IRS, which relate to the

expenses of operating personal vehicles for business purposes rather than compensation.  (Docket

Entry No. 24, Ex. C, at 1).  Gibson's own paychecks and his 2010 Form W-2 show that NCRC did

not report the reimbursement of $0.50 per mile he received ($375.00 after taxes) for nonproductive

or travel time as part of his wages.  (*See id.*, Ex. G (showing separate payment for hours worked and

mileage)).  The record includes evidence that NCRC failed to count time Gibson spent driving from

one customer's work site to another in determining the number of hours he worked in a work week.

The record includes evidence showing that this policy was companywide.  Gibson has made the

requisite showing that he is similarly situated to other field service technicians with respect to

NCRC's policy of not including time spent driving between customers' job sites in determining

overtime compensation.

NCRC points out that field service technicians choose their own assignments and work

different hours under different conditions, and that NCRC had a program that allowed field service

technicians to correct their hours.  These differences do not undermine a finding that the technicians

are similarly situated.  These differences do not detract from the evidence of a consistent policy of

not including the time spent driving between work sites in wages paid or in determining overtime

eligibility.

NCRC's arguments appear in part to assert that whether a particular employee was entitled to overtime in a given work week, and the amount, require individual determination. But because the records show the distances driven and amount nonproductive time for each employee, the relevant differences in the driving distances and time, and the effect of the $0.50 per mile reimbursement, appear to be matters that can be addressed with relative efficiency by objective arithmetic calculations. Under such circumstances, courts have found that the need for individual factual determinations is not fatal to certification of a FLSA collective action. And to the extent that discovery reveals that other field service technicians' claims complicate joint proceedings, there are means to aid in making individualized fact determinations, including bifurcation of liability and damages.

The Fifth Circuit approved bifurcation in a similar case, *Moreau v. Klevenhagen*, 956 F.2d 516 (5th Cir. 1992). In *Moreau*, a group of deputy sheriffs sought overtime compensation for time spent in weapons training. *Id.* at 518. The district court bifurcated the case into a liability phase and a damages phase, with separate discovery to be conducted on each issue. *Id.* at 522. After the liability phase, the court granted a defense motion for summary judgment. *Id.* at 523. The Fifth Circuit reversed, finding clear evidence of a written policy under which deputies would not be paid overtime for firearms training. "Whether any deputies were actually deprived of overtime compensation because of the County's firearm qualification policy should have been addressed only at the damages stage of the proceedings." *Id.* The panel remanded to the district court to determine whether any deputies were owed overtime pay and, if so, how much. *Id.; see Barfield v. Madison Cnty.*, 212 F.3d 269, 271 (5th Cir. 2000) (describing the district court's decision to bifurcate FLSA collective action into separate trials for liability and damages); *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1410 (5th Cir.1990) (same); *Falcon*, 580 F. Supp. 2d at 541 ("[T]he Court is willing to

10

consider bifurcating the liability and damages stages of the trial if it will be in the interest of judicial economy.").

NCRC points out that California state law imposes different overtime compensation requirements. To the extent the California employees are subject to a related, yet distinct consistent policy, a subclass or separate class may be required, but the case law supports making such a determination on the basis of the more extensive record available after conditional certification. *See Pedigo v. 3003 S. Lamar, LLP*, 666 F. Supp. 2d 693, 700 & n.1,  (W.D. Tex. 2009) (conditionally certifying a class even though later discovery may show that the court should create subclasses or narrow the class); *Lopez v. Sam Kane Beef Processors, Inc.*, Civ. No. CC-07-335, 2008 WL 565115, at *2 (S.D. Tex. Feb. 29, 2008).

The evidence of a common compensation policy distinguishes this case from *Simmons*, a case on which NCRC relies. *Simmons* involved allegations by sales employees at various retail locations that "dozens (if not hundreds) of different low-level supervisors with wide management discretion in practice violate [their employer's] clear, lawful written policies at some or many of [their employer's] more than one hundred different retail locations." 2007 WL 210008, at *6. Because of the numerous differences among the employees in the proposed class, the court found no reasonable basis to infer that the defendant had "a common plan or practice [requiring the class] to work uncompensated overtime at many of its locations in Texas." *Id.* The problem in *Simmons* was not that the differences existed, but that the differences made it impossible to infer that a common policy existed. Here, however, the record provides a reasonable basis to infer that NCRC had a  policy of not counting noncommute drive time in determining whether employees were entitled to overtime compensation.

NCRC's argument that a collective action should not be certified because Gibson has failed to show that other class members are interested in joining the suit is unpersuasive. Gibson concedes that he cannot meet this requirement but contends that it is inappropriate in light of his work conditions. NCRC field service employees did not report to an office, where they would get to know each other. Instead, they traveled directly from their homes to work sites. *See, e.g.*, Docket Entry No. 27-3, ¶ 5 ("Only in rare circumstances have I ever worked with any other service technician."). In cases arising out of such work conditions, the requirement to show other interested individuals before notice is issued creates a "chicken and egg" problem, *see Harris v. Vector Mktg. Corp.*, 716 F. Supp. 2d 835, 838 (N.D. Cal. 2010); *Davis v. Westgate Planet Hollywood Las Vegas, LLC,* No. 2:08-cv-00722-RCJ-PAL, 2009 WL 102735, at *12 (D. Nev. Jan. 12, 2009); *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 267 (D. Minn. 1991) (discussing the "chicken and egg" problem in the context of showing that a proposed class is similarly situated); *Sperling*, 118 F.R.D. at 406 (same). Many courts confronted with such a record do not require a plaintiff to show that other class members are interested in joining the litigation. *See, e.g.*, *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 466 (S.D.N.Y. 2008) ("FLSA plaintiffs are not required to show that putative members of the collective action are interested in the lawsuit in order to obtain authorization for notice of the collective action to be sent to potential plaintiffs."); *Neary v. Metro. Prop. & Cas. Ins. Co.*, 517 F. Supp. 2d 606, 622 & n.7 (D. Conn. 2007). Gibson has identified a significant number of other similarly situated field service technicians. In light of what the present record reveals about the circumstances of Gibson's employment, it is inappropriate to require a showing that other similarly situated plaintiffs are interested in joining the litigation before conditionally certifying a collective action and issuing notice.

This court will conditionally certify a collective action of NCRC service technicians employed within the last three years with respect to the claim that they were not paid overtime as required by the FLSA because NCRC did not include time spent driving between customers' work sites in determining overtime eligibility.

### B.      The Minimum Wage Claim

Gibson also claims that NCRC's failure to compensate for nonproductive time other than by reimbursing the field service technicians approximately $0.50 per mile — which Gibson contends covered only expenses for using a personal automobile for the employer's purposes — violated the FLSA minimum-wage requirement.   NCRC argues that this court should deny conditional certification as to this issue because the FLSA allows "wage averaging" and the record makes clear that it paid minimum wage each week.  NCRC argues that dividing total compensation, including the mileage reimbursement, by the number of hours Gibson claims to have worked makes it clear that minimum wages were paid.  Gibson earned a productive rate of pay of $18.00 and a nonproductive rate of $.50 per mile.  NCRC argues that even if the per-mile reimbursement is not included at all, Gibson's lowest per-hour compensation never fell below $13.20 each week he worked for NCRC.  (Docket Entry No. 27, p. 9; Affidavit of Clay Orey, Ex. 1).

Gibson does not dispute that dividing total wages by total hours worked per week is the appropriate way to determine whether a minimum-wage violation has occurred.  Gibson argues that the mileage-rate reimbursement was not, however, paid as wages and cannot be counted in determining whether the minimum-wage was satisfied for the time spent driving.  The record shows an apparent inconsistency between NCRC's written policy stating that the mileage-based reimbursement is included in compensation for determining minimum wage for driving, and the records showing that NCRC did not report this compensation to the IRS as part of Gibson's wages.

13

But Gibson has not responded to NCRC's argument that even if the mileage-based reimbursement is not included in the amount of wages paid in a work week, he was nonetheless paid well above minimum wage.  Although it is not necessary for Gibson to present proof of his claim on the merits at this stage, *McKnight v. D. Houston, Inc.*, 756 F. Supp. 2d 794, 802 (S.D. Tex. 2010) (collecting cases), courts hesitate to order conditional certification and notification when doing so would be "an exercise in futility."  *See, e.g.*, *Basco v. Wal-Mart Stores, Inc.*, No. Civ. A. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004).  Gibson must clarify his minimum-wage theory and state what support exists in the record and case law no later than **July 25, 2011**.

## IV.    Conclusion

Based on the present record, the following class is conditionally certified as to the overtime pay claim: NCRC employees with the title of field service technician or performing the job duties of a field service technician,  who were employed within the last three years.  Gibson must clarify his minimum-wage claim and state what support exists in the record and case law no later than **July 25, 2011;** NCRC may file a response no later than **August 1, 2011.**  By **August 19, 2011**, NCRC must provide the names, current or last known addresses and telephone numbers, and dates of employment of the members of this class.  Notice must be sent no later than **September 23, 2011**. The parties must file a proposed amended scheduling and docket control order no later than **August 19, 2011**.  The dates set for the joint pretrial order and docket call are cancelled in light of this order.

SIGNED on July 18, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

14